FILED

98 NOV 24 PM 2: 48

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **BETTY STATEN** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **CV-98-PT-0055-M** |
| | ) |
| **CONGRESS LIFE INSURANCE** | ) |
| **COMPANY, ET AL.** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

ENTERED

NOV 24 1998

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This cause came on to be heard at a bench trial.

### Facts

The underlying evidence is somewhat undisputed.  Certain inferences are disputed.

Defendant Congress Life Insurance Company ("Congress Life") is the insurer and underwriter of the insurance policy at issue. Defendant Corporate Benefit Services of America, Inc. ("CBSA") is the third-party administrator of the pertinent health plan. Betty Staten is a resident of Marshall County, Alabama and, at all times relevant herein, worked at Marshall Manor Nursing Home.

1

Betty Staten was employed in the laundry area and worked for
Marshall Manor for thirteen and a half years.

Betty Staten testified that she only signed the application
for the subject insurance. She testified that Wanda Jones asked
her questions and that she answered the questions Wanda Jones
asked honestly. Ms. Jones did not testify at trial. Betty
Staten signed the application, but the remaining portions of the
application were completed by Ms. Jones or someone else.
Question 1 on the application asked whether the applicant had
ever experienced or taken medication for a number of medical
conditions, including "back trouble." This question was answered
in the negative. Question 2 asked Staten whether she had sought
medical treatment during the past five years. Although that
question was answered in the affirmative, the only medical
treatment disclosed on the application is the removal of a cyst
by a doctor two or three years prior to the application date.
Dr. Darnell is not listed on the application, nor were any of
Staten's visits to his office disclosed.

The policy was issued, and the effective date of Staten's
coverage was October 17, 1996. Lori Herzog of CBSA testified at
trial that had CBSA known the truth about Staten's history of
treatment by Dr. Darnell it would have, at the very least,
insisted on a rider excluding coverage for back-related problems.
Herzog also testified, however, that she could not define "back

2

trouble."  She apparently did not consider a back sprain to be

"back trouble."  She acknowledged that it's a "very broad term."

The pertinent language from Staten's certificate of

insurance is as follows:

Within 12 months prior to a participant's effective
date of coverage under the policy, he/she may have:
(1) had an illness or injury diagnosed; (2) received
care, medical services or treatment for an illness or
injury; or (3) had symptoms of an illness or injury
which would cause an ordinarily prudent person to seek
diagnosis, care, medical services or treatment.  If so,
the following waiting periods shall apply to such pre-
existing illness or injury:[1]

1.    The following waiting period applies to each
      participant if: (a) the policy does not replace
      the participating employer's other group health
      plan; or (b) a participant first becomes covered
      under the policy after the original effective date
      of the policy:

      Benefits are not payable for expenses incurred as
      a result of a pre-existing illness or any
      complications of any such illness or injury until:
      (a) the participant had had no care, medical
      services, treatment or expenses incurred for that
      illness or injury for a period of any six months
      in a row after his/her effective date of coverage
      under the policy; or (b) the participant has been
      insured under the policy for 12 months in a row;
      whichever happens first.  No benefits are payable
      for charges for care, medical services, treatment
      or other expenses incurred during the waiting
      period for any such illness or injury.

The insurance policy includes the following definitions.

Illness:        a physical illness or a nervous or
                mental disorder.

---

[1]The defendants acknowledge that they rely only on (2) and
(3).

3

Injury:          Bodily damage caused by an accident.
                 The bodily damage must result from the
                 accident, directly and independently of
                 all other causes of loss.[2]

As part of her job, Ms. Staten was required to lift wet

linens out of washing machines and place them in buggies. To

perform this task, she had to bend at the waist to lift the

bundles of wet linens. Ms. Staten last worked for Marshall Manor

on December 8, 1996. She had become disabled to work. Dr.

Thomas Darnell, a family physician in Guntersville, Alabama, is

Ms. Staten's family doctor. Dr. Darnell testified that the back

is "a very complex system of bones and muscles and tendons and a

lot of different tissues." His patients commonly complain of

back pain, and Dr. Darnell stated that this pain can be caused by

numerous medical conditions. These conditions include strains

and sprains. Back pain can also result from activities such as

heavy lifting. The office notes of Dr. Darnell are attached to

the stipulation of the parties. These records show:

- (a)    In February 1992, Staten saw Dr. Darnell
         complaining of pain in her right arm and numbness
         in her fingers. This had occurred over a period
         of a couple of months.

- (b)    In March 1992, Staten saw Dr. Darnell for a re-
         check of the problems she was experiencing with

---

[2]The parties acknowledge that there is no evidence of an
injury caused by an accident.

4

her right arm and fingers, and Dr. Darnell's
office notes indicate she was still experiencing
those problems.

(c)   On March 1, 1993, Staten saw Dr. Darnell
complaining of pain in the middle of her back that
"radiates down both legs."

(d)   On May 8, 1995, Staten saw Dr. Darnell for pain in
the left side of her back that radiated down her
left leg.

(e)   On February 19, 1996, Staten saw Dr. Darnell
complaining of lower back and shoulder pain.

(f)   On March 18,1996, Staten again saw Dr. Darnell
complaining of pain in her right shoulder and arm.

Dr. Darnell did no diagnostic testing to determine the cause of

any of these problems.   Rather, he treated Staten conservatively

by prescribing pain medication, etc.   While he wrote "bursitis"

in his office notes, Dr. Darnell testified that he could not say

what was causing Staten's complaints: "I can't say that it was a

result from the bursitis. I can't say what the pain was, no."   In

February of 1996, Ms. Staten also received medication for high

blood pressure.

On November 5, 1996, Ms. Staten saw Dr. Darnell about new

symptoms, and, upon his examination of Ms. Staten, Dr. Darnell

determined that she suffered from some low back pain and numbness

and tingling in her legs.   Following the November 5, 1996 visit

to Dr. Darnell, Ms. Staten's condition did not improve.   Ms.

Staten then sought treatment from a nurse practitioner, Nell

Hannon, at Guntersville Family Clinic.   Ms. Hannon referred Betty

5

Staten to a neurologist, Dr. Ngo.  Dr. Ngo initially performed a

neurological examination of Ms. Staten and sent her to the

hospital for tests.  After reviewing the tests, Dr. Ngo admitted

Ms. Staten into the hospital for more tests, including an MRI.

Dr. Ngo ordered that Ms. Staten be taken to Huntsville Hospital

for surgery.

On December 15, 1996, Dr. Joel Pickett performed an anterior

cervical discectomy and fusion at C6-C7.  Plaintiff's Exhibit 7.

On December 16, 1996, plaintiff was discharged from Huntsville

Hospital by Dr. Pickett.  Id.  These problems were described in a

December 12, 1996 admitting report as:

> HISTORY OF PRESENT ILLNESS: This is a 50 year-old,
> right-handed, black female who is a patient of Dr.
> Smith's and Dr. Darnell's in Guntersville.  She was
> referred for an evaluation of the recent onset of leg
> weakness and sensory impairment.
>
> She was in her usual state of health.  There was no
> recent history of head or neck trauma.  Approximately
> 3-4 weeks ago, she began to note the gradual onset of
> leg stiffness.  It has become increasingly worse.  She
> has difficulty ambulating now.  Her legs are very
> stiff.  She has difficulty bending her legs when she
> walks.  Her legs jerk periodically occasionally at
> times.  She also experiences numbness in her legs and a
> tightness sensation around her trunk.  The level of
> sensory abnormality tends to be somewhere below her
> breasts bilaterally.  Her bowel and bladder function
> remain intact.  She does not loose control.  She has
> had no urgency.  She has noted increasing pain in the
> upper lumbar and lower thoracic regions in the past one
> month.
>
> She has not had episodes of gait staggering, multi
> focal numbness or sensory loss in the past.  There is
> no history of visual impairment or pain in the past.
> There is no change in mentation.  She has not had loss

of consciousness. Her breathing has been fine. She
has not had problems with dysphasia or dysarthria.
There are no chronic headaches. She has not had
recurrent fevers, chills or sweats. She has not had
weight loss. There is no rash. There are no
associated rashes or swelling of joints. (emphasis
added).

. . .

BACK: There is spinal tenderness in the upper thoracic
spine. The central spine is also tender with traction
and rotation. Lasegue's sign is negative bilaterally.

. . .

There appears to be definitely disc disease at multiple
levels, particularly in the lower cervical region. Her
clinical examination is certainly consistent with
probably a C7 radiculopathy associated with a
compressor myelopathy. It appears to me at this time
that this is poorly a spinal cord problem. She may
have transverse myelitis or cervical disc disease. The
differential diagnoses should also include an epidural
mass such as metastasises. The epidural compression
has to be at least in the upper thoracic and probably
lower cervical region. This would certainly go along
with left C7 radiculopathy. Differential diagnoses for
transverse myelitis would include sarcoidosis, multiple
sclerosis, ischemic cord disease and infectious
myleopathy. . . .

CT OF THE CERVICAL SPINE:

Study was performed following cervical myelogram.
Central disc protrusion C3-C4 narrowing the
subarachnoid space and abutting the cervical cord.
There is also central disc protrusion at C4-C5
narrowing the subarachnoid space and abutting the
cervical cord. Spondylitic spurs C5-C6 causing mild
neural foraminal stenosis at this level and narrowing
of the subarachnoid space at this level. There is left
paracentral disc herniation at C6-C7 compressing the
cervical cord and exiting nerve root. Spondylitic
spurs are also present at this level causing moderate
neural foraminal stenosis. The rest of the disc spaces
appear normal. Dural sac, spinal canal and the rest of

7

the neural foramina are normal.  The cervical cord
shows an area of indentation at C6-C7 on the left side.
Otherwise, it appears normal.

IMPRESSION:

(1)   Left paracentral disc protrusion at C6-C7
      compressing the cervical cord and exiting nerve
      root.
(2)   Central disc protrusion C3-C4 and C4-C5 causing
      narrowing of the subarachnoid space at these
      levels.
(3)   Mild neural foraminal stenosis C5-C6 and moderate
      neural foraminal stenosis C6-C7 secondary to
      spondylitic spurs.

CT OF THE LUMBAR SPINE:

Study was performed following cervical myelogram.
Examination reveals a right paracentral disc herniation
L3-L4 indenting the dural sac and compressing the
exiting nerve root.  There is a right central and right
paracentral disc herniation at L4-L5 narrowing the
subarachnoid space and indenting the dural sac at this
level.  There is also compression of the exiting nerve
root.  Degenerative disc space narrowing and gas within
the disc material are present at this level.
Degenerative facet joint changes also present at this
level. Facet hypertrophy contributing to the neural
foramina and spinal canal stenosis at this level.
Degenerative disc space narrowing and gas within the
disc material at L5-S1 with no areas of disc
herniation.  Mild facet and ligamental hypertrophy at
this level causing mild neural foraminal stenosis.

IMPRESSION:

(1)   Right paracentral disc herniation L3-L4.
(2)   Central and right pararcentral disc herniation L4-
      L5.  Degenerative disc space narrowing are present
      at this level and there is also degenerative
      spinal stenosis and neural foraminal stenosis at
      this level.
(3)   Degenerative disc disease L5-S1 with mild neural
      foraminal stenosis.  (The CT of the cervical and
      lumbar spine were obtained in the prone position.)

                          .  .  .

                            8

IMPRESSION:

(1)  Changes at C5-C6 and C6-C7 most likely due to disc
     herniation.
(2)  Changes at L3-L4 and L4-L5 also thought to be
     secondary to disc herniations.

(Dx.11).

Dr. Pickett, who performed surgery on December 15, 1996

stated, inter alia,

     FINAL DIAGNOSIS: Herniated nucleus pulposus at C6-7
     with spinal cord compression and cervical myelopathy.

     PROCEDURE PERFORMED:  Anterior cervical diskectomy and
     fusion at C6-7.

     HISTORY OF PRESENT ILLNESS: Ms. Staten is a 51 year-old
     white female patient who presented for evaluation by
     Dr. Ngo with a 4 week history of lower extremity
     weakness.  He found findings consistent with myelopathy
     and workup including a cervical myelogram revealed
     evidence of a disk herniation at C6-7.  She was
     transferred to Huntsville Hospital for neurosurgical
     evaluation and care.  (emphasis added). ·

     CHIEF COMPLAINT: Lower extremity weakness.

     HISTORY: Ms. Staten is a 51 year-old white female that
     presented in Boaz with a three to four week history of
     lower extremity weakness.  This was most pronounced on
     the left side and had begun to interfere with her gait.
     She also had noted some numbness in the lower
     extremities as well from the chest down.  Evaluation
     revealed some small vessel disease throughout the white
     matter on a MRI scan of the head and a cervical MRI
     that revealed diffuse spondylosis with stenosis in the
     lower cervical spine.  There was some motion artifact
     on this study and no transverse views were available.
     Thoracic MRI scan revealed no significant cord
     compression.  She underwent a total myelogram that
     revealed stenosis at the C-6, 7 level with a post-
     myelogram CT revealing spondylosis as well as what
     appears to be a disc herniation on the left.  There was
     also fairly significant central stenosis in the lumbar

9

spine at L3, 4; L4, 5 and L5, S1.   (emphasis added).

. . .

IMPRESSION: Brown-Sequard syndrome probably secondary
to disc herniation spondylosis at C-6, 7.

(Dx.11).

On December 24, 1996, Dr. Ngo reported:

Betty returns today for further follow-up.  We recently
admitted her to the hospital for a new onset of neck
stiffness and spacticity.  It was found through MRI and
myelogram that she had cervical disc herniation.  We
referred her to a neurosurgeon in Huntsville.  She
underwent a laminectomy.  The surgery was uneventful.
Unfortunately, she has not had significant results from
that.  Her gait is still quite unsteady and stiff.
(emphasis added).

(Dx.11)

On December 31, 1996, Dr. Ngo reported,

Betty returns today for further follow-up.  She had
undergone cervical laminectomy.  The surgery had not
helped significantly.  She still has quite a bit of
weakness, sensory loss in the upper abdomen and spasm
in the lower legs.  She is not falling.  Baclofen so
far has helped her considerably.  She does not have
nocturnal myoclonus and leg drawing.  She is able to
sleep through the night.  She is tolerating her
medication well otherwise.  (emphasis added).

(Dx.11).

Most of the medical reports after November 1, 1996 reflect
that the symptoms she then had began after the effective date of
the subject policy.  In her deposition, she said "I think it was
sometimes in September.  I'm not sure of the date . . . ." The
court concludes that, as corroborated by the medical reports,

10

plaintiff's testimony at trial, that the more recent symptoms
began in November, are credible.  The plaintiff strikes the court
as being a credible witness.

During the relevant period, defendants denied medical claims
in the amount of $34,118.18.

On April 28, 1997, Betty Staten, by and through counsel of
record, requested a review of the denial of medical claims.  On
May 21, 1997, CBSA denied the appeal through the following
response:

> The Security Life policy defines a pre-existing
> condition: If within 12 months prior to a participant's
> effective date of coverage under the policy the
> participant had:
>
> 1.   such illness or injury diagnosed;
> 2.   received care or treatment for an illness or
>      injury;
> 3.   had symptoms of an illness or injury which would
>      cause an ordinarily prudent person to seek
>      diagnostic care, medical services or treatment.
>
> Medical records contained in the claim file have been
> reviewed once again in light of your appeal.  Records
> from Dr. T. Darnell indicate Ms. Staten was seen for
> hypertension, back and shoulder pain on 2-19-96.  Since
> she did receive care for these conditions prior to the
> effective date of 10-17-96, the denial of these
> expenses must stand as previous processed.
>
> We wish we could supply a more favorable response,
> however, we must abide by policy guidelines.

The denial letter from CBSA made no reference to any alleged
misrepresentation and failed to include a reservation of rights.

The following are pertinent excerpts from Dr. Darnell's

deposition:

Dr. Darnell's deposition, the only deposition admitted at trial, includes the following with respect to his examinations within the twelve month period.[3]

Q.   Did you see Ms. Staten again in February of 1996?

A.   February the 19th, 1996.

Q.   And, again, if you could read your office notes from that visit.

A.   Okay.  She complained again of low back pain and also shoulder pain to the right side.  She states the pain had started on Thursday, February the 15th of 1996.  She had been taking multiple over-the-counter pain pills, etc., and had been taking her Estrace.

She was also noted to have somewhat elevated blood pressure at that time.  We repeated it, and it was a little better.  Lungs were clear; heart was normal; the abdomen was soft.  She had pain over the front part of her right shoulder in the area where we commonly see bursitis.

I diagnosed her as having hypertension, primarily bursitis.  I started her on some antihypertensive medication and gave her a pain medication which is the Ultram, U-l-t-r-a-m, 50 milligrams to be taken every four hours as needed for pain.

Q.   That's a prescription pain medicine?

A.   This is a prescription pain medicine.

. . .

Q.   Did you see Ms. Staten again in March of 1996?

A.   March the 18, 1996.

Q.   Would you read those notes please, Doctor?

---

[3]In effect, Dr. Darnell was the only expert who testified.

12

A.    She was back in to recheck her blood pressure and also continued to have the pain in the right shoulder and arm area.  She stated that the Ultram that I had given her had not helped her pain at all.  She had been taking her Norvasc, which is her antihypertensive medication, N-o-r-v-a-s-c, as well as her Estrace.  Her blood pressure was better; her lungs were clear; heart was normal.

She was still having the tenderness in the right shoulder with what I designated as a positive impingement sign.  That is an examination we do where you manipulate the shoulder in such a way to elicit pain in the front part of the shoulder.  It's a common sign of a bursitis type effect.

I again felt that she had bursitis as well as her hypertension.  I refilled her medication.  And at that time having tried the previous medication that didn't work, I gave her an injection of cortisone.

. . .

Q.    As a treating physician, is there a difference between pain and loss of sensation?

A.    Yes.

Q.    Okay.  And would the difference between pain and loss of sensation be something that you would factor into your diagnosis of your particular patient?

A.    It would assist.

Q.    Okay.  And can loss of sensation and pain be symptoms of different conditions?

A.    Yes, they can be a different problem.

Q.    Would the same be true for extremity weakness?

A.    As far as?

Q.    Symptoms of different conditions.

A.    Oh, yes, it could be symptoms of different problems.

13

Q.   Is there a difference between disc herniation and
a muscle strain?

A.   Oh, most definitely.

Q.   Are they different conditions?

A.   They are different conditions.

Q.   Is there a difference between disc herniation and
bursitis?

A.   Yes.

. . .

Q.   Is it fair to say that there are numerous medical
conditions that can cause back pain?

A.   Yes, sir, there are numerous.

. . .

Q.   . . .   Assume for me that the extremity weakness
we're talking about is in the legs.

A.   Okay.

Q.   Would that be consistent or a symptom of that
condition?

A.   That would be more complex depending upon the
degree of the herniation.  You're referring to a C6-C7
herniation which is in the lower neck, not in the back.
It can be, though it is more uncommon for a cervical
problem to result in a leg problem.  You know, that is
a different set of neurons, nerves, up and down the
spinal column.

      More commonly, disc problems that would result in
sensation or motor loss to the legs would be coming out
of the lumbar area.  You know, I can't say that they
couldn't come out of the cervical depending upon
exactly the degree of the impingement in the C6-C7
area.  I would have to say that most C6-C7 problems to
my knowledge would not involve a lower extremity
problem.

14

. . .

Q.   On February 19th, 1996, did you diagnose Betty
Staten as suffering from spinal cord compression.

A.   No, sir.

Q.   Did you diagnose Ms. Staten on that day as
suffering from disc herniation?

A.   No, sir.

Q.   Did you diagnose Ms. Staten on February 19th,
1996, as suffering from cervical disc disease?

A.   No sir.

. . .

A.   If I was concerned and thought she had a herniated
disc problem that significant, you know, you have to
evaluate further to see what is going on.

Q.   Okay.  So in February of 1996, were you of the
opinion that Ms. Staten was suffering from any of the
conditions that I described to you which are spinal
cord compression, disc herniation or cervical disc
disease?

A.   I would not diagnose her as that.

Q.   Was your conclusion related to bursitis?

A.   I felt she had shoulder bursitis to her right
shoulder and then also of concern was her hypertension.

Q.   And the treatment that you prescribed on February
19th, '96, did it have any relationship to treatment
for spinal cord compression, disc herniation or
cervical disc disease?

A.   No, sir.

. . .

A.   At that time she was — you're talking about the
March 18th --

15

Q.   Yes, sir, I believe.

A.   — 1996?  She was in primarily to recheck her blood
pressure, and she also continued to have pain in the
right shoulder and arm area.  I have no notation about
any back problems at that time.

. . .

Q.   Okay.  During your March 1996 visit, did you reach
your same conclusion as to the condition that was
causing her problem, that being the bursitis?

A.   I felt that she was continuing based upon
examination to have some problems with her right
shoulder bursitis.

Q.   Okay.  As a result of her March 1996 visit, did
you diagnose Ms. Staten as suffering from either spinal
cord compression, disc herniation, or cervical disc
disease?

A.   I have no evidence of that.

Q.   If in fact you had been concerned that she
suffered from those conditions, would you have
recommended further testing?

A.   I did no further testing, you know, looking for
any of the above-mentioned problems.

Q.   Is the treatment that you prescribed in March of
1996, does it relate solely to your diagnosis of
bursitis and then --

A.   Hypertension.

Q.   — hypertension?

A.   Yes, sir.

Q.   Okay.  Did you prescribe any treatment in March of
1996 for spinal cord compression, disc herniation, or
cervical disc disease?

A.   No, sir.

Q.   Okay.  Mr. Carroll didn't ask you, but I'd like to

16

ask you a few questions about a visit that you had with Ms. Staten in November of 1996.  Do your records reflect that she visited you on November the 5th, 1996?

A.    Yes, November 5th, 1996.

Q.    And what was her chief complaint at that time?

A.    She had complaints of some low back pain.  She said both legs tingled and she felt numb for a couple of days prior to this presentation. . . .  She states this all started on the Wednesday before that, I guess October the 30th, 1996.

. . .

Q.    Now on November 5th of 1996, did you question Ms. Staten as to the period of time that she suffered from lower back pain and legs tingling?

A.    She states that had been going on for two days.

Q.    And the "X two days," that means that's your shorthand?

A.    Times two days.

Q.    Okay. So based on your conversation with her, is it fair to say that you were under the impression that her back pain and legs tingling had occurred on or about November 3rd of 1996?

A.    That's what I would assume.

. . .

Q.    The physical exam that is described on Plaintiff's Exhibit no. 1, did the description that Dr. Pickett provided differ from the physical examination that you performed on Ms. Staten back in February and March of 1996?

A.    What date?

Q.    I'm looking now back to February of '96 and March of '96.

17

A.    From February and March of 1996, I didn't have any
of these findings, no.

.  .  .

Q.    And as part of your examination of Ms. Staten in
February or March of 1996, did you have any concerns or
belief at that time that she suffered from a disc
herniation at the C6-C7?

A.    To my examination, she appeared to have a bursitis
to the right shoulder.

.  .  .

Q.    Okay.  Dr. Darnell, is it fair to say that the
back pain that Betty Staten described to you in March
and February of 1996, that it was your opinion that it
resulted from the bursitis?

    MR. CARROLL: Object to the form.

A.    I can't say that it was a result from the
bursitis.  I can't say what the pain was, no.

Q.    Okay.  Is it accurate then that your diagnosis in
February and March of 1996 was bursitis?

    MR. CARROLL: Object to the form.

A.    Yes, sir.

.  .  .

Q.    Doctor, as a result of your examination of her in
February and March of 1996, did you diagnose her with
bursitis?

A.    Yes, sir.

Q.    And did you also treat her for that condition?

A.    Yes, sir.

.  .  .

Q.    And we've established that when she saw you in

18

November of 1996 she had complained of lower back pain
and tingling in her legs; correct?

A.    November of '96?

Q.    Yes, sir.

A.    Yes.  She had both legs tingled and felt numb
starting a couple of days prior to this presentation.

Q.    And she also complained of lower back pain at that
time; correct?

A.    Yes, sir.

Q.    And that was similar to complaints she's had in
the past?

        MR. MARSHALL:  object to the form.

A.    The back pain was.  I don't have any record of the
numbness or tingling.

                        . . .


Q.    Doctor, I know you described earlier a herniation
generally being the result of a sudden process.  What
do you mean by sudden process?

A.    Something that takes place over a brief period of
time.  Many times, particularly we're referring to
herniated discs, some event such as lifting, straining.
I have seen people with a ruptured or herniated disc
from a cough.  That change in pressure, a sudden
pressure upon the vertebral column, will cause a
rupturing effect of the disc.

Q.    And does it generally cause symptoms to result
fairly quickly thereafter?

A.    Fairly quickly.  There can be a slow process, but
most of them are — many patients can point to when it
occurred.

Interestingly, neither attorney directly questioned Dr. Darnell

as to whether he had an opinion as to whether her late October -
December 1996 condition pre-existed prior to the effective date
of the policy.  Further, interestingly, neither Dr. Ngo nor Dr.
Pickett has been so questioned.  The decision of the defendants
to deny plaintiff's claim was not made by any expert, nor was it
based upon the opinion(s) of any experts.  The parties agree that
Dr. Darnell is to be considered an expert, but he was not
questioned by the defendants prior to the taking of his
deposition.  They did review his notes.

     The parties agree that the twelve month window period that
the court is to consider is October 17, 1995 to October 17, 1996
and that the review of the court is de novo.

     Although the pre-operative radiological reports indicated
disc problems in the thoracic and lumbar regions, no surgery was
performed in these areas.  No explanation has been offered.  The
only surgery was in the C6-C7 areas and apparently was not
successful with regard to the October - November 1996 symptoms.
Nobody has ever testified as to what specifically caused the
problems complained of in late October through early November
1996.

     Apparently, plaintiff had been covered by group insurance at
some date prior to the subject policy.  It is not clear when this
was.  In any event there is no reasonable inference that
plaintiff set out to obtain coverage because of her concern about

any medical problem. She simply obtained coverage when her employer obtained new group coverage.

In effect, Dr. Darnell was the only expert to testify at the trial. The only "expert" evidence is his testimony and the medical notes. No expert gave an opinion that plaintiff's post-October 17, 1996 condition was pre-existing. Certainly it had not been diagnosed. Further, she had not received any "care, medical services or treatment" for what she was diagnosed for in November 1996. Further, there is no substantial evidence that the symptoms for which plaintiff sought treatment manifested themselves during the applicable twelve month period.

## Conclusions

### Misrepresentation Defense

As a factual matter, the court concludes that plaintiff did not intentionally misrepresent any medical history in her application. The court further concludes that "back trouble" is, as defendant's representation agreed, ambiguous and it is thus due to be construed against the defendants.[4]  The court concludes that the plaintiff answered the questions posed to her and did not fill in the application. Further, Dr. Darnell did

---

[4]See Burton v. State Farm, 533 F.2d 177, 178-179 (5th Cir. 1976).

21

not diagnose her as having "back trouble."  Further, the court

cannot conclude that mere back spasms should be considered as

"back trouble." [5]

The court further concludes that, in any event, the

defendants waived any alleged misrepresentation in the

application defense.  See <u>Martin v. Pate</u>, 862 F.2d 513, 518-20

(5th Cir. 1988) (applying state law in considering an ERISA

claim). Using Alabama law as a basis for determining ERISA common

law, the court concludes, in the alternative, that defendants

waived the misrepresentation defense.  (<u>Swint v. Protective Life</u>

<u>Ins. Co.</u>, 779 F.Supp. 532 (S.D. Ala. 1991) and <u>First Alabama Bank</u>

<u>of Montgomery v. First State Ins. Co.</u>, 899 F.2d 1045, 1063(11th

Cir. 1990).[6]

Pre-Existing Condition

The court concludes that the defendants had the burden to

prove a pre-existing condition within twelve months of the

---

[5] See <u>Miller v. Dobbs Mobile Bay, Inc.</u>, 661 So.2d 20, 206
(Ala. 1995) (Key 8).

[6] The court finds <u>Weber v. St Louis Univ.</u>, 6 F.3d 558 (8th
Cir. 1993), to be distinguishable.  Application of the waiver of
defense law does not amount to an "oral modification of the
plan."  Further, <u>Weber</u> deals with an issue of coverage, not a
defense.  Further, the Weber court held that "the only materials
currently in evidence as to the date of onset . . . are
insufficient to sustain a verdict for either . . ."  The court is
not aware of whether Weber gave any consideration to state law.
The court notes that <u>Loyola Univ. of Chicago v. Humana Ins. Co.</u>
996 F.2d 895 (7th Cir. 1993) relies on Illinois law.

22

effective date of the policy.  See <u>Cleary v. Knapp Shoes, Inc.</u>,
924 F.Supp. 309, 315-16 (D.Mass 1996).  This burden was to not
only prove a pre-existing condition in general, but also to prove
at least one of the three conditions listed in the policy.  See
<u>Burton v. State Farm</u>, 533 F.2d at 178.  At trial defendants'
representative, testified, in substance, that if plaintiff
suffered from a condition as to which she had exhibited no
symptoms and had received no treatment during the twelve month
period, the conditions would not apply.  Comparing (2) and (3) of
the pertinent policy provisions, the court cannot find that
plaintiff "received care, medical services or treatment" within
the twelve month period for the condition she was diagnosed for
in December 1996.  Further, the court cannot find that she had
"symptoms of [the] illness . . . [which manifested in November
1996] which would cause an ordinarily prudent person to seek
diagnosis, care, medical services or treatment" prior to the
effective date of the policy.  Again, she cannot be held to a
higher level of prudence than Dr. Darnell.

The court concludes that the defendants did not satisfy
their burden to prove at least one of the three stated conditions
in the policy.  Defendants did not rely upon any expert
opinion(s)in making their decisions that the post-October 17,
1996 condition(s) pre-existed... .  Further, there has been no
such expert opinion offered at trial.  Dr. Darnell did not treat

23

plaintiff nor cause her to be treated by others for the
conditions she first complained of after October 17, 1996.
Apparently, her condition was not even appropriately diagnosed
after her post-October 17, 1996 complaints.  The operation was
said to be unsuccessful.  The plaintiff cannot be held to a
higher standard of self-diagnosis than her physicians.  Again,
plaintiff did not, within the applicable twelve month period,
have the "illness ... diagnosed," although she had been to Dr.
Darnell.  Defendants admit this.  She did not receive "care,
medical services or treatment for [the] illness" diagnosed after
October 17, 1996 before October 17, 1996.  She was earlier
treated for bursitis.  Further, although plaintiff sought
treatment during the twelve month period, there is no reasonable
inference that she had the symptoms for which she sought
treatment after October 17, 1996.  It would be pure speculation,
in the absence of expert opinion, for the court to conclude
otherwise.  There may be a suspicion of a continuum, but the
court cannot decide based upon suspicion.  Plaintiff worked in a
job which could commonly cause back sprains.[7]  The court cannot
conclude that she earlier had symptoms of the type she first
manifested three-four weeks before December 1996.[8]

---

[7]Compare United Security Life Ins. Co. v. Sikes, 40 Ala.
App. 677, 122 So.2d 289 (Ala. Civ. App. 1960).

[8]For further support for the proposition of looking to state
law, see Horton v. Reliance Standard Life Ins. Co., 141 F.3d

24

The court ultimately finds and concludes that:

(1)  Plaintiff did not intentionally misrepresent any matters in her application.

(2)  There were no unambiguous statements in plaintiff's application which could form the basis for failure to issue or to call for an amendment to the policy.

(3)  In the alternative, defendants waived defense(s) on the basis of (1) and (2) above.

(4)  The defendants did not meet their burden to prove one or more of the three excluding conditions of coverage, particularly in the absence of expert testimony supporting such position(s).

Within ten days, plaintiff's attorney will confer with defendants' attorney to see if they can agree on the appropriate amount of medical expenses.  Any such agreement will be without waiver of any grounds of appeal arising out of the foregoing Findings of Fact and Conclusions of Law.  If the parties cannot agree on the amount, plaintiff's attorney will advise the court and the matter will be set for further hearing.  If they can agree, plaintiff's attorney will submit a proposed judgment within twenty days.

---

1038, 1041 (11th Cir. 1998).  For further support on the waiver issue, see First Ala. Bank v. First State Ins. Co., Inc., 899 F.2d 1045 (11th Cir. 1990).

25

This _____ day of November, 1998.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE